Brian J. Stretch (State Bar No. 163973)
United States Attorney
Barbara Valliere (State Bar No. DCBN 439353)
Chief, Criminal Division
John H. Hemann (State Bar No. 165823)
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102
Telephone: (415) 436-7478
Fax: (415) 436-7234
John.Hemann@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

William P. Keane (State Bar No. 124756)
wkeane@fbm.com
Nell K. Clement (State Bar No. 260426)
nclement@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Lyn R. Agre (State Bar No. 178218)
lagre@kasowitz.com
Kasowitz, Benson, Torres & Friedman LLP
101 California Street, Suite 2300
San Francisco, CA 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

Attorneys for Defendant
DISCOVERY SALES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DISCOVERY SALES, INC.,

Defendant.

Case No. CR16-00199

**JOINT SUPPLEMENTAL SENTENCING MEMORANDUM; ADDITIONAL SENTENCING STATEMENT BY THE UNITED STATES**

Date: December 8, 2016
Time: 3:00 p.m.
Judge: Hon. Yvonne Gonzalez Rogers
Courtroom: 1, Fourth Floor

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION. ........ 1

II. FACTUAL AND PROCEDURAL BACKGROUND. ........ 2

A. Relevant Factual Background. ........ 2

B. Economic Crisis. ........ 2

C. Procedural History and the June 3, 2016 Hearing. ........ 3

III. SUMMARY OF PLEA AGREEMENT SENTENCE. ........ 4

IV. THIS COURT SHOULD DEPART FOUR LEVELS DOWNWARD BECAUSE THE OFFENSE LEVEL SUBSTANTIALLY OVERSTATES THE SERIOUSNESS OF DSI'S OFFENSE. ........ 5

A. The Court Has Authority to Depart Downward From The Applicable Guidelines Offense Level and A Downward Departure is Justified. ........ 6

1. The "Multiple Causation" Scenario. ........ 7

2. The "Economic Reality" Scenario. ........ 9

3. The $75 Million Loss Figure Overstates the Seriousness of DSI's Conduct. ........ 10

B. A Downward Departure of Four Levels Is Warranted. ........ 11

V. THE SECTION 3553(A) FACTORS SUPPORT THE PLEA AGREEMENT SENTENCE. ........ 12

A. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment. ........ 12

B. To Afford Adequate Deterrence to Criminal Conduct. ........ 12

C. The Need to Provide Restitution to the Victims. ........ 13

VI. RESTITUTION AMOUNT IN THE PLEA AGREEMENT. ........ 13

**ADDITIONAL SENTENCING STATEMENT BY THE UNITED STATES ........ 15**

I. MULTIPLE SOURCES CONTRIBUTED TO LOSS. ........ 15

II. UNCERTAINTY OF LOSS AMOUNT. ........ 16

III. IT IS UNCERTAIN WHETHER DEFENDANT DSI COULD BE COMPELLED TO PAY A LARGER FINE. ........ 17

## TABLE OF AUTHORITIES

**Page**

### FEDERAL COURT CASES

*In re Morgan,*
506 F.3d 705 (9th Cir. 2007) .......... 15

*United States v. Booker,*
543 U.S. 220 (2005) .......... 6

*United States v. BP Products North America Inc.,*
610 F.Supp. 2d 655 (S.D. Tex. 2009) .......... 15

*United States v. Bundy,*
359 F.Supp.2d 535 (W.D. Va. 2005) .......... 15

*United States v. Carey,*
895 F.2d 318 (7th Cir.1990) .......... 8

*United States v. Carty,*
520 F.3d 984 (9th Cir. 2008) .......... 12

*United States v. Forchette,*
220 F. Supp. 2d 914 (E.D. Wis. 2002) .......... 6, 7, 9

*United States v. Gregorio,*
956 F.2d 341 (1st Cir. 1992) .......... 8

*United Sates v. Keller,*
2005 WL 6192897, 3:04-CR-233-G (N.D. Tex. Oct. 17, 2008) .......... 8

*United States v. Lane,*
323 F.3d 568 (7th Cir. 2003) .......... 7, 9, 10

*United States v. Lamonda,*
2008 WL 68744, No. 6:05-cr-131-Orl-28UAM (M.D. Fla. Jan. 2, 2008) .......... 8

*United States v. LaPoint,*
16 F. Supp. 3d 1006 (N.D. Iowa 2014) .......... 8

*United States v. MacCaull,*
2002 WL 31426006, No. 00 CR 91-13 RWS (S.D.N.Y. Oct. 28, 2002) .......... 9, 11

*United States v. Mohamed,*
459 F.3d 979 (9th Cir. 2006) .......... 6

*United States v. Monaco,*
23 F.3d 793 (3d Cir. 1994) .......... 8

*United States v. Morris,*
744 F.3d 1373 (9th Cir. 2015) .......... 5, 9, 10

*United States v. Roen*,
279 F. Supp. 2d 986 (E.D. Wis. 2003) ........ passim

*United States v. Rogers*,
39 F.3d 1190 (9th Cir. 1994) ........ 7,8

*United States v. Rostoff*,
53 F.3d 398 (1st Cir. 1995) ........ 8, 9, 11

*United States v. Sarno*,
73 F.3d 1470 (9th Cir. 1995) ........ 7

*United States v. Shattuck*,
961 F.2d 1012 (1st Cir. 1992) ........ 7

*United States v. Sterlino*,
4:13-cr-00231-JSW, ECF No. 31 ........ 3

*United States v. Wang*,
Case No. 4:11-CR-00686-JSW ........ 16

*United States v. Ware*,
282 F.3d 902 (6th Cir. 2002) ........ 7, 8

*United States v. Working*,
287 F.3d 801 (9th Cir. 2002) ........ 11

*United States v. Xiao*,
Case No.4:13-CR-00052-JSW ........ 16

*United States v. Zevada, Park, Arenas, and Phan*,
Case No. 4:13-CR-00556-YGR ........ 16

## FEDERAL STATUTORY AUTHORITIES

18 U.S.C. §1014 ........ 11

18 U.S.C. § 1344 ........ 1

18 U.S.C. § 3553(a) ........ 6,12,13

## FEDERAL RULES AND REGULATIONS

Fed. R. Crim. P. 11 ........ 16

Fed. R. Crim. P. 11(c)(1)(C) ........ 1, 16

## ADDITIONAL AUTHORITIES

U.S. Sentencing Guidelines Manual § 2B1.1 ........ 1, 4, 5

U.S. Sentencing Guidelines Manual § 8C2.3 ........ 4
§ 8C2.4(d) ........ 4
§ 8C2.5 ........ 4
§ 8C2.5(b)(5) ........ 4
§ 8C2.5(g)(2) ........ 4
§ 8C2.6 ........ 4

Fin. Crisis Inquiry Comm'n, *Fin. Crisis Inquiry Comm'n Report* (2011), https://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf ........ 2

Paul Krugman, *How Did Economists Get It So Wrong?*, THE NEW YORK TIMES MAGAZINE, (Sept. 2, 2009), http://www.nytimes.com/2009/09/06/magazine/06Economic-t.html?_r=0 ........ 2

Alex Markels, *Comparing Today's Housing Crisis with the 1930's*, U.S. NEWS & WORLD REPORT (Feb. 28, 2008), http://money.usnews.com/money/personal-finance/real-estate/articles/2008/02/28/comparing-todays-housing-crisis-with-the-1930s ........ 2

## I. INTRODUCTION.

Following the June 3, 2016 arraignment of Discovery Sales, Inc. ("DSI") on a one-count Information alleging a violation of 18 U.S.C. § 1344, the United States and DSI appeared before this Court later that day for a change of plea and proposed sentencing pursuant to a plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Before taking the matter under submission, the Court ordered the parties to file a joint supplemental sentencing memorandum to provide additional support for the parties' agreement on a four-level downward departure because the offense level generated from the loss calculation substantially overstates the seriousness of the offense. *See* U.S.S.G. § 2B1.1, App. Note 20(C). As the parties set forth below, including in the United States' Additional Sentencing Statement at the end of this joint memorandum, the four-level downward departure is supported by compelling legal and factual grounds. Specifically, the $75 million loss calculated for Sentencing Guidelines purposes overstates the seriousness of the offense as to DSI and warrants the proposed departure because: (i) multiple sources beyond DSI's control contributed significantly to the loss amount; (ii) the economic reality is that the victim banks did not actually suffer a loss anywhere near the $75 million Guidelines number; and (iii) the $75 million figure does not take into consideration a number of additional evidentiary factors that would likely result in a lower loss number. In fact, the only provable loss actually suffered by an identifiable victim in this case is $2,976,622, which has been rounded up to the $3 million that DSI has agreed to pay Fannie Mae and Freddie Mac in restitution. Using this $3 million loss number would have resulted in an eight-level decrease in DSI's guidelines calculation, rendering the four-level downward departure agreed to by the parties reasonable and appropriate under these circumstances.

In light of these undisputed facts, the parties respectfully submit that the $8 million penalty agreed to by DSI, along with the $3 million in restitution, is a fair and equitable resolution to this matter.

//

//

//

## II. FACTUAL AND PROCEDURAL BACKGROUND.

### A. Relevant Factual Background.

Discovery Sales, Inc. ("DSI") is a privately held company that was established to sell new homes in the East Bay area of Northern California. During the relevant time period, 2006-2008, Ayman Shahid, the then officer and vice president, directed and managed all day-to-day aspects of DSI's activities. Ayman Shahid committed the crime of bank fraud to which he pled guilty. Based on a *respondeat superior* theory of liability derived from the guilty plea of Ayman Shahid and two other former DSI employees, DSI agrees as a corporate defendant that it is liable for the actions of its three former employees. DSI is therefore willing to enter a guilty plea to one count of bank fraud.

The relevant factual background provided in the plea agreement is set forth in DSI's sentencing memorandum filed on May 26, 2016 at Section I.A.

Additionally, of the homes DSI sold between 2006-2008, some utilized the incentive programs that formed the basis of the government's investigation. A portion of the homes that utilized these programs were later foreclosed on, resulting in a potential loss to the lender.

### B. Economic Crisis.

The U.S. housing market crash and economic crisis that emerged in 2008-2010 have been well chronicled. The unforeseen drastic downturns caught business people of all types and the country's top economists by surprise. *See* Alex Markels, *Comparing Today's Housing Crisis with the 1930's*, U.S. News & World Report (Feb. 28, 2008), http://money.usnews.com/money/personal-finance/real-estate/articles/2008/02/28/comparing-todays-housing-crisis-with-the-1930s (comparing the housing slump to the Great Depression); Fin. Crisis Inquiry Comm'n, *Fin. Crisis Inquiry Comm'n Report* (2011), 215, https://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf (from their peak in 2006, housing prices in the U.S. dropped a "stunning" 17% by the end of 2008, and 28% by end of 2009); *Id.* at 354 (Federal Reserve Chairman Ben Bernanke: "… I honestly believe that September and October 2008 was the worst financial crisis in global history, including the Great Depression."); Paul Krugman, *How Did Economists Get It So Wrong?*, The New York Times Magazine (Sept. 2,

2009), http://www.nytimes.com/2009/09/06/magazine/06Economic-t.html?_r=0 ("Few economists saw our current crisis coming…."). The housing crisis peaked immediately following the 2006-2008 time period in which DSI used the incentive programs at issue in this case. The crisis continued to wreak havoc on the U.S. housing market for several subsequent years, lowering the value of homes across the country and particularly in states such as California.

### C. Procedural History and the June 3, 2016 Hearing.

Since the government inquiry in February 2010, DSI has cooperated with the government's investigation. Throughout this almost 7 year investigation, DSI responded to all government document requests, communicated as requested with the government and its agents, and produced every employee witness the government requested to interview. Also during this time, as the Court is aware, three former DSI employees have entered guilty pleas and two are currently awaiting sentencing.[1]

DSI and the government engaged in extensive discussions lasting over 18 months leading to the current plea agreement before this Court. Both the government and DSI believe the resolution, described in detail below, more than adequately addresses DSI's acceptance of responsibility in this matter.

On June 3, 2016, DSI and the government appeared before this Court for a change of plea hearing and possible sentencing. At that hearing, the Court indicated preliminary approval of all but one of the Guidelines calculations included in the plea agreement:

- "In terms of the calculations I would agree with you that we are dealing with a base offense level of seven under the sentencing guide section 2B1.1(a)(1) and that the calculation increases 24 levels under 2B1.1(b)(1)(M).
- "I would also agree that the culpability score starts at a base level of five under section 8C2.5(a) and then is increased one level under 8C2.5(b)(5) and then decrease two levels under 8C2.5(g)(2), which gives a culpability score of four and a

---

[1] Jason Sterlino was sentenced by U.S. District Court Judge Jeffrey White on February 16, 2016 to six months custody, three years supervised release, $100 special assessment and a $4,000 fine. *See U.S. v. Sterlino*, 4:13-cr-00231-JSW, ECF No. 31.

fine multiplier of .8 to 1.6 under section 8C2.6."

ECF No. 12 (Transcript of June 3, 2016 Hearing) 3:6-14; 14:16-17 ("I don't think there is a disagreement with respect to the other calculations."). However, the Court indicated that it did not have enough information with regard to the four-level downward departure based on the loss amount overstating the seriousness of the offense.[2] *See id.* at 3:15-16; 7:17-20. The Court ultimately did not rule on the plea agreement at the June 3 hearing and instead ordered the parties to submit this supplemental briefing on the proposed four-level departure.

## III. <u>SUMMARY OF PLEA AGREEMENT SENTENCE.</u>

Pursuant to the plea agreement, the parties agree that the offense level should be calculated as set forth below, resulting in a base fine of $8.5 million and a fine range of $6.8 to $13.6 million. Within that range, the parties have agreed on an $8 million fine.

| | |
|---|---|
| <u>Offense Level</u> (U.S.S.G. §§ 8C2.3 and 2B1.1) | |
| Base Offense Level, U.S.S.G. § 2B1.1: | 7 |
| Specific Offense Characteristic, U.S.S.G. § 2B1.1: | 24 |
| Downward Departure, U.S.S.G. § 2B1.1, cmt. 20(C): | -4 |
| Total Offense Level: | 27 |
| Base Fine | $8.5 million |
| <u>Culpability Score</u> (U.S.S.G. §§ 8C2.5) | |
| Base Score, U.S.S.G. § 8C2.5(a): | 5 |
| Involvement or Tolerance, U.S.S.G. § 8C2.5(b)(5): | 1 |
| Acceptance, U.S.S.G. § 8C2.5(g)(2): | -2 |
| Total Culpability Score: | 4 |
| <u>Fine Multiplier</u>, U.S.S.G. § 8C2.6: | .8-1.6 |
| <u>Fine Range</u>, U.S.S.G. § 8C2.4(d): | $6.8 to $13.6 million |

---

[2] The Court's discussion at the June 3 hearing of possible downward departure scenarios demonstrated that the plea agreement fine of $8 million would also be captured with a three-level departure. *See* ECF No. 12 at 4:4-6 ("Finally, if I went three levels down instead of four, then I would be at a base number of 10 million with a range of 8 million to 16 million.").

The 24-level increase to the offense level is based on a loss amount of $75 million that falls within the $65 to $150 million range at § 2B1.1(b)(1)(M)-(N). The $75 million loss figure was calculated by an economic consultant for the government utilizing the two-step process approved by the Ninth Circuit in *United States v. Morris*: 1) calculate the greater of intended or actual loss, with the actual loss usually being the principal of the loan; and 2) detect the amount recorded or recoverable by the creditor from the sale of collateral. 744 F.3d 1373, 1374-75 (9th Cir. 2015). This two-step process applies to standard mortgage fraud cases; this is not such a case.

Notably, in conducting this estimation of loss,[3] the government's consultant focused strictly on home sales during the relevant time period in which the buyers received incentives from the programs at issue and the homes for a variety of reasons later went into foreclosure. This analysis was not based on an examination of the evidentiary record on a loan package-by-loan package basis, and does not purport to isolate DSI's culpability on a loan-by-loan basis.

## IV. THIS COURT SHOULD DEPART FOUR LEVELS DOWNWARD BECAUSE THE OFFENSE LEVEL SUBSTANTIALLY OVERSTATES THE SERIOUSNESS OF DSI'S OFFENSE.

The United States Sentencing Guidelines calculation in the plea agreement before the Court includes a four-level downward departure under Section 2B1.1, Application Note 20(C) (downward departure appropriate where offense level overstates the seriousness of the offense). This four-level departure is justified because the Guidelines offense level, driven primarily by the loss amount, substantially overstates the seriousness of DSI's offense in three ways: 1) the Guidelines offense level is based on a loss amount that is the product of multiple sources, not solely DSI's conduct; 2) the Guidelines offense level does not adequately reflect the economic reality of the actual loss to the lender banks; and 3) the $75 million loss figure does not take into consideration a number of evidentiary factors that would likely result in a lower loss number. This Court has the discretion to grant the four-level downward departure agreed to by the parties and provided in the plea agreement. The parties request that the Court exercise this discretion and accept the plea agreement sentence.

---

[3] The sentencing court need only make "a reasonable estimate" of loss. U.S.S.G. § 2B1.1, App. Note 3(C).

**A. The Court Has Authority to Depart Downward From The Applicable Guidelines Offense Level and A Downward Departure is Justified.**

Section 2B1.1, Application Note 20(C) of the United States Sentencing Guidelines states: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." For the reasons stated below, this is one such case.

In 2005, the United States Supreme Court in *U.S. v. Booker* declared that application of the Sentencing Guidelines was no longer mandatory for district courts in imposing criminal sentences. 543 U.S. 220, 245 (2005). After *Booker,* the Sentencing Guidelines are advisory – district courts are required to consider the Sentencing Guidelines under 18 U.S.C. § 3553(a)(4), but are also permitted to tailor the sentence in light of other Section 3553(a) factors. *Id.* Despite the advisory nature of the Sentencing Guidelines, district courts routinely utilize downward departures in making sentencing determinations. The Ninth Circuit views a district court's implementation of a downward departure as "an exercise of post-*Booker* discretion to sentence a defendant outside the applicable guidelines range[.]" *U.S. v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006).

In fraud-related cases, the Guidelines calculation is driven in large part by the loss amount and, therefore, a departure analysis often focuses on factors that affect the amount of loss. *See U.S. v. Roen*, 279 F. Supp. 2d 986, 990 (E.D. Wis. 2003) ("Because the loss determination essentially dictates the severity of the sentence, it is this determination that will almost always be the subject of departure scrutiny."). Thus, a downward departure may be warranted when "the loss determination results in an offense level that substantially overstates the seriousness of the severity of the offense." *Id.* The district court for the Eastern District of Wisconsin, in *United States v. Forchette,* summarized cases in which a downward departure was granted based on a loss amount that overstated the seriousness of the offense and identified several scenarios to which this departure is appropriate, two of which are relevant to this case.[4] 220 F. Supp. 2d 914, 924-25

[4] *Forchette* and the cases cited therein focus on application notes for since-repealed Section 2F1.1 of the Sentencing Guidelines, which specifically references the "amount of loss" as overstating the seriousness of the offense. However, as noted by the district court in *Roen*, the change from Section 2F1.1 to Section 2B1.1 and the elimination of any reference to loss amount is "one of style

(E.D. Wis. 2002). The two scenarios that provide grounds for a downward departure relevant to this case are: 1) "multiple causation," when the amount of loss is the product of sources separate from the defendant's conduct; and 2) a scenario when the Guidelines loss calculation does not reflect the "economic reality" of the loss actually suffered by the victims. *See also U.S. v. Lane*, 323 F.3d 568, 588 (7th Cir. 2003) (stating that a sentencing court has the discretion to depart downward and modify the loss amount to more accurately reflect the "economic realities of the crime.").[5] Either of these scenarios, alone, is an independent and legitimate basis for a downward departure. *Forchette*, 220 F. Supp. 2d at 929; *Roen*, 279 F. Supp. 2d at 991-92 (granting nine-level departure based only on "economic reality" scenario).

1. <u>The "Multiple Causation" Scenario.</u>

In this case, the $75 million loss figure is the product of multiple sources separate from DSI's conduct, including the participation and complicity of the preferred lenders in the problematic implementation of the incentive programs; the culpability of individual homebuyers who failed to disclose incentives on loan documents; and the subsequent nationwide housing-market downturn and economic crisis during the relevant time period which dramatically inflated the amount of loss in this case.

In this situation where there are multiple causes of the loss amount beyond the defendant's control, the Ninth Circuit, along with numerous other circuit courts, has endorsed this "multiple causation" scenario as a valid basis for downward departure. *See U.S. v. Sarno*, 73 F.3d 1470, 1501 (9th Cir. 1995) ("[D]efendant may seek a downward departure to mitigate distortions occasioned by forces beyond the defendant's control.")[6]; *see also U.S. v. Ware*, 282 F.3d 902, 907

---

rather than substance[.]" 279 F. Supp. 2d at 990 (quotations omitted).

[5] *Forchette* describes the "economic reality" scenario as one in which there is a gross disparity between the defendant's intended loss, which is used as the Guidelines loss amount, and the actual loss suffered by the victims. 220 F. Supp. 2d at 924-25. However, the Seventh Circuit in *Lane* demonstrates that the "economic reality" basis for downward departure can apply beyond the specific scenario described in *Forchette*. 323 F.3d at 588, 592 (affirming district court's downward departure based on the "economic realities of the crime" when pre-departure Guidelines level was based on actual loss calculation).

[6] The Ninth Circuit in *Sarno* relies on First Circuit law. 73 F.3d at 1501 (citing cases collected in *U.S. v. Shattuck*, 961 F.2d 1012, 1016-17 (1st Cir. 1992)). *See also U.S. v. Rogers*, 39 F.3d 1190

(6th Cir. 2002); *U.S. v. Rostoff*, 53 F.3d 398, 406-07 (1st Cir. 1995); *U.S. v. Monaco*, 23 F.3d 793, 799 (3d Cir. 1994); *U.S. v. Gregorio*, 956 F.2d 341, 344–48 (1st Cir. 1992); *U.S. v. Carey*, 895 F.2d 318, 323 (7th Cir.1990). The reason a departure is necessary in these circumstances is because "the victim loss table in U.S.S.G. § [2B1.1] presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court." *Gregorio*, 956 F.2d at 346-47. So any portion of the total loss sustained by the victim as a consequence of factors extraneous to the defendant's conduct is not deducted from total "victim loss" prior to the determination of the applicable guideline sentencing range. *Id.*

The First Circuit case of *United States v. Rostoff* is on point. 53 F.3d 398 (1st Cir. 1995). In *Rostoff*, defendant real estate developers worked with individual buyers and bank representatives to provide bank loans to borrowers to purchase condominiums, who later defaulted. *Id.* at 403. The defendants' Guidelines offense levels were driven in large part by the loss suffered by the FDIC, when the bank granting the loans became insolvent. *Id.* at 404. The *Rostoff* district court granted defendants' downward departures, finding that numerous factors, apart from defendants' involvement, inflated the FDIC losses. *Id.* 405. Primarily, the *Rostoff* district court focused on three causal factors: 1) the bank employees' involvement in the program and the court's skepticism over senior bank management's professed lack of knowledge or responsibility; 2) the individual condominium buyers' willing participation in the program; and 3) the collapse of the real estate market. *Id.* The First Circuit found the district court's downward departures reasonable, holding that the district court's finding of multiple causation was a proper legal basis to depart. *Id.* at 407, 411.[7]

All three of the sources that contributed to the Guidelines loss amount in *Rostoff* and justified a downward departure, in addition to defendants' conduct, also exist in this case with

---

(9th Cir. 1994) (departure appropriate where, as a result of events outside of defendant's control, "the measure of loss is disproportionate to the defendant's culpability") (unpublished).

[7] In *Rostoff*, the First Circuit's holding applied to the pre-1991 version of the Sentencing Guidelines. However, subsequent case law demonstrates that courts have continued to endorse "multiple causation" as a basis for downward departures under later versions of the Guidelines. *U.S. v. LaPoint*, 16 F. Supp. 3d 1006, 1009 (N.D. Iowa 2014); *U.S. v. Lamonda*, 2008 WL 68744, No. 6:05-cr-131-Orl-28UAM, at *22 (M.D. Fla., Jan. 2, 2008); *U.S. v. Keller*, 2005 WL 6192897, 3:04-CR-233-G, at *5 (N.D. Tex Oct. 17, 2008); *Roen*, 279 F. Supp. 2d at 990-91.

equal force. The loan agents for the lender banks in these transactions were aware of these incentive program payments. *See also infra* Additional Sentencing Statement by the United States. Similarly, the buyers were complicit: many did not disclose the incentive payments on the loan applications they submitted to the banks. *See also infra* Additional Sentencing Statement by the United States. The loan agents and buyers also had a responsibility to disclose these incentives.[8]

Finally, as set forth above, the downturn of the housing market and U.S. economy as a whole during the relevant time period of 2008-2009 was both historic and unforeseen. These market and economic forces had a nearly unprecedented impact on housing prices, which resulted in tens of thousands of homes in California going into foreclosure, including some that were sold by DSI utilizing the incentive programs at issue in this case. *See supra* Section I.B. There is no dispute that these larger economic forces played a significant role in causing the $75 million loss figure calculated using the *Morris* formula. As the court in *Rostoff* acknowledged, it would be unfair to apply the $75 million loss figure without recognizing how that number was generated by forces beyond the control or expectation of DSI.

2. <u>The "Economic Reality" Scenario.</u>

As stated previously, the Guidelines loss amount here is calculated under the Ninth Circuit's *Morris* formula – measuring the difference between the loan amount and the amount of the home sold after default. A downward departure based on the "economic reality" entails a scenario when the Guidelines loss calculation does not reflect the "economic reality" of the loss actually suffered by the victims. *Lane*, 323 F.3d at 588; *see also Forchette*, 220 F. Supp. 2d at 924-25 (downward departure appropriate when defendant's intended loss, used in Guidelines loss calculation, "bears no relation to 'economic reality.'"). In *Lane,* the Seventh Circuit reviewed the district court's sentencing of a real estate developer convicted of multiple counts of making fraudulent loan statements to a bank in violation of 18 U.S.C. §1014. 323 F.3d at 573. The

---

[8] The difficulty in apportioning loss between defendants and uncharged participants is a basis for departing downward. *See U.S. v. MacCaull*, 2002 WL 31426006, No. 00 CR 91-13 RWS, at *12-13 (S.D.N.Y. Oct. 28, 2002) (downward departure because loss amount was difficult, if not impossible, to apportion fairly).

Seventh Circuit upheld the district court's downward departure based on the Guidelines loss amount overstating the seriousness of the offense after consideration of ultimate losses to the bank victims. *Id* at 586, 588. As stated by the Seventh Circuit in *Lane*, "Once the amount of loss is calculated under the guidelines, the court has the discretion to modify the amount of loss to more accurately reflect the economic realities of the crime and the time to take economic realities into account is at the district court's downward departure decision." (citations omitted). *Id.* at 588.

The $75 million loss figure reflected in the Guidelines offense is grossly overstated and does not reflect the economic reality of the loss actually suffered by the banks. In fact, the lender banks generated revenue by originating and initially servicing the loans at issue and then again by repackaging and securitizing most of the loans on the secondary market. *See infra* Additional Sentencing Statement by the United States. Given that the $75 million loss figure drastically overstates the actual losses suffered by the banks, the Court should exercise its discretion and depart downward so that the ultimate sentence more accurately reflects the economic reality of DSI's conduct in this matter.

3. <u>The $75 Million Loss Figure Overstates the Seriousness of DSI's Conduct.</u>

Both the government and DSI agree that the $75 million loss figure included in the plea agreement Guidelines calculation overstates the seriousness of DSI's offense. This loss figure is based on an initial analysis conducted by the government's consultant prior to the commencement of any plea negotiations. In arriving at this figure, the government's consultant focused strictly on home sales during the relevant time period in which the buyers received incentives from the programs at issue and the homes later went into foreclosure for whatever reason. This analysis was not based on an examination of the evidentiary record on a loan package-by-loan package basis, and does not purport to isolate DSI's culpability on a loan-by-loan basis, as would occur if the case were to go to trial or the loss amount was contested at an evidentiary sentencing hearing.

While the $75 million loss figure is consistent with the *Morris* formula, it does not take into account various evidentiary factors and therefore likely overstates the seriousness of DSI's conduct in this case.

### B. A Downward Departure of Four Levels Is Warranted.

The four-level downward departure included in the plea agreement sentence results in a Guidelines offense level that appropriately reflects the seriousness of DSI's offense. As case law and experience make clear, the grounds for the actual extent of the downward departure at issue here is often difficult to justify quantifiably or by a ready formula. Consequently, the quantity of downward departure is within the district court's broad discretion. *U.S. v. Working*, 287 F.3d 801, 809 (9th Cir. 2002). There is no "algebraic formula" to determine a departure's extent, but rather determining the size of a departure is "quintessentially a judgment call." *Rostoff*, 53 F.3d 398, 409; *see also Working*, 267 F.3d at 809.

The four-level departure agreed to by the parties falls squarely in the range of precedents for downward departures where the loss amount overstates the seriousness of the offense. In upholding the district court's finding that the loss overstated the seriousness of the offense based on similar factors present in the instant case, the *Rostoff* court upheld departures that slashed offense levels by 1/3 and more – defendants facing between 27 months at the low end and as high as 41 months received sentences of 9 months and probation. 53 F.3d at 404, 411-12; *see also Roen*, 279 F. Supp. 2d at 990 (nine-level departure); *MacCaull*, 2002 WL 31426006, at *13 (five-level departure based, in part, on difficulty in apportioning loss between defendants and uncharged individuals).

A four-level departure is appropriate in this case where the government is unable to identify which financial institutions lost money, if any, except as to Fannie Mae and Freddie Mac. The rounded up $3 million restitution figure stands as the only calculated number representing the actual loss. In contrast, the $75 million loss amount calculated for Guidelines purposes has no such provable link to any actual loss. That figure is all-in and not a fair or reasonable measure of DSI's culpability. Indeed, the overstated $75 million figure is eight levels higher than the calculated loss of $3 million. In these circumstances, a four-level departure is reasonable. Similarly, a four-level departure is necessary in order to apportion causation to the loan agents, buyers and the housing-market downturn, all of which played a significant role in generating the $75 million loss number. *See also infra* Additional Sentencing Statement by the United States.

## V. THE SECTION 3553(A) FACTORS SUPPORT THE PLEA AGREEMENT SENTENCE.

At sentencing, the "overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; [and] to protect the public . . . ." *U.S. v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citing 18 U.S.C. § 3553(a)). 18 U.S.C. Section 3553(a) requires a district court to consider various statutory factors in determining the sentence in a criminal case, in addition to the Sentencing Guidelines. Here, the Section 3553(a) factors, taken individually and together, support the sentence agreed to in the plea agreement.

### A. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment.

A key section 3553(a) factor is the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). The plea agreement before the Court provides for all of the above. DSI is entering a guilty plea and accepting responsibility for the actions of its former employees. As punishment, DSI, a privately owned company, is paying an $8 million fine, which takes into account the government's investigation cost in this matter, and is paying full restitution to Fannie Mae and Freddie Mac. This guilty plea, the probationary period, accompanying fine, and restitution adequately reflect the seriousness of the offense. Additionally, DSI has suffered collateral consequences as a result of the ongoing investigation and the proposed plea agreement. Over the past almost 7 years, the investigation into this matter has caused disruption in the business activities of DSI and its employees. Over the course of the investigation, DSI ownership has incurred significant legal and other expenses related to this matter. While DSI has fully cooperated with the investigation, ownership has been subject to increased scrutiny by those who engage in business with the company.

### B. To Afford Adequate Deterrence to Criminal Conduct.

The sentence set for in the plea agreement of a five year probationary period, an $8,000,000 fine secured by a bond paid for by the Defendant and $3,000,000 in restitution is

adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). The fine, restitution and related bond fees outlined in the plea agreement and supporting documentation have a meaningful and direct impact on ownership's finances that is sufficient to deter any future criminal conduct on the part of DSI.

**C. The Need to Provide Restitution to the Victims.**

The proposed plea agreement includes payment of full restitution to the identified victims of the offense, Fannie Mae and Freddie Mac. *See* 18 U.S.C. § 3553(a)(7). Under the terms of the Agreement, DSI will pay $3 million, slightly more than the only provable loss actually suffered by identifiable victims.

## VI. RESTITUTION AMOUNT IN THE PLEA AGREEMENT.

The Court indicated at the June 3 hearing that the actual loss suffered by Fannie Mae and Freddie Mac for restitution purposes, as reflected in Exhibit B to the Government's Sentencing Memorandum, originally appeared to be $3,456,622. However, this does not account for the fact that one of the loans, 2209 Truman Lane, ultimately sold for more than the loan amount, resulting in a restitution amount agreed to by the parties of $3 million.

Dated: December 1, 2016

BRIAN J. STRETCH
United States Attorney

By: */s/ John H. Hemann*
John H. Hemann
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Dated: December 1, 2016

FARELLA BRAUN + MARTEL LLP

By: */s/ William P. Keane*
William P. Keane

Attorneys for Defendant
DISCOVERY SALES, INC.

Dated: December 1, 2016

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By: */s/ Lyn R. Agre*
Lyn R. Agre

Attorneys for Defendant
DISCOVERY SALES, INC.

## ADDITIONAL SENTENCING STATEMENT BY THE UNITED STATES

This Court has broad discretion to accept or reject a plea agreement under Rule 11(c)(1)(C). The text of the rule does not "define the criteria by which a district court should exercise the discretion the rule confers, or explain how a district court should determine whether to accept a plea agreement. *In re Morgan*, 506 F.3d 705, 710 (9th Cir. 2007). "This conspicuous omission ... appears to be intentional, as the drafters stated that the decision to accept or reject a plea agreement should be 'left to the discretion of the individual trial judge,' rather than governed by any bright-line test." *Id.* at 710 n. 2 (quoting Fed. R. Crim. P. 11, advisory committee note). "In exercising its discretion, a court should take into account 'the exigencies of plea bargaining from the government's point of view,' including 'limited resources and uncertainty of result.'" *United States v. BP Products North America Inc*., 610 F.Supp. 2d 655, 674 (S.D. Tex. 2009), quoting *United States v. Bundy,* 359 F.Supp.2d 535, 538 (W.D. Va. 2005).

The United States recommends that the Court accept the plea agreement negotiated by the parties. The agreement, if accepted, will result in a fine that is significant in relation to most criminal cases and notable because few criminal cases were filed in the wake of the 2006-2008 mortgage fraud crisis. The fine we recommend here would be the third largest imposed in a criminal case brought by the United States Attorney's Office in this District since 2013, and the second largest actually collected (the almost $19 million fine imposed in *United States v. Liew*, CR-11-0573-JSW, is not likely to be collected).

A negotiated plea resulting in an $8 million fine, plus an additional $3 million in restitution to Fannie Mae and Freddie Mac, is appropriate in the government's view in part because of its assessment of the uncertainty in the results were the case to proceed to trial. This separate section of the Joint Brief by the United States will supplement the factual basis for a finding that the $75 million loss figure overstates the seriousness of the offense and describes litigation risks facing the government.

### I. MULTIPLE SOURCES CONTRIBUTED TO LOSS.

Were this case to be tried and sentencing contested, the government would be required to prove that DSI proximately caused losses to the victim banks. There is sufficient uncertainty

surrounding this that a negotiated resolution is greatly preferable to a contested sentencing following a trial.

DSI was one of the participants in the process that resulted in loan losses on the homes it sold. DSI worked with two preferred lenders. The preferred lenders knew that DSI, at times, used incentives to close home sales. Preferred lender employees worked closely with DSI employees, in some circumstances in the same office facilities and through joint ventures; these employees had deep knowledge of DSI's practices.

In other instances, bank employees processing loans for homes sold by DSI participated in other fraudulent activities that caused fraudulent loan applications to be approved and loans funded. For example, a Bank of America loan officer, Jennifer Xiao, was indicted for facilitating loans on DSI homes in exchange for bribes orchestrated by a mortgage broker, Sharon Wang. *See United States v. Jennifer Xiao,* Case No.4:13-CR-00052-JSW, and *United States v. Sharon Wang,* Case No. 4:11-CR-00686-JSW. In other instances, mortgage brokers working on loans for DSI homes arranged for false loan applications supported by documents created by a crooked tax preparer, and bribed underwriters to push the loans through the lender's approval process. See *United States v. Zevada, Park, Arenas, and Phan,* Case No. 4:13-CR-00556-YGR.

Finally, in many instances, the buyers who submitted loan applications included false information on the applications or knew that false information was being submitted on their behalf. On some occasions, the buyers were duped by certain DSI salespeople or unscrupulous mortgage brokers, but on most occasions, the buyers knew that the loan applications being submitted to the banks were false, misleading, or incomplete in some form or fashion. This too would create uncertainty as to proof of causation at a contested sentencing.

## II. UNCERTAINTY OF LOSS AMOUNT.

This case arises from the crucible of the 2006-2008 mortgage crises. There were many victims and many people and institutions bear responsibility. Unfortunately, the line between the two is not particularly clear.

Not only are there multiple victims in this case, it would be difficult if not impossible to determine who they are and how much they lost. In the first instance, the "victims" were the

banks to whom borrowers, acting at the direction and with the assistance of DSI employees and agents, made false statements and misleading omissions in loan applications. The majority of the loans at issue in this case were originated by lenders for whom DSI had a preferred relationship, but there were many others, from large banks like Bank of America to small lenders like Homecomings Financial.

But that is not the thorniest problem. The thorniest problem is that, for the most part, the banks that originated the loans for DSI-sold properties almost always sold the loans almost immediately after they were funded. Sometimes the loans were sold to institutions like Fannie Mae and Freddie Mac which held them. But very often they were sold and then sold again, and frequently they were bundled with other mortgages and securitized. Only the party holding the mortgage when the buyer stopped making payments and the loan was foreclosed lost money; everyone else along the line made money, including the individuals who short sold the securities made up of bad mortgages that had been bundled together. Identifying innocent purchasers of bad mortgages and quantifying their losses would be an unduly complex, if not impossible, task.

## III. <u>IT IS UNCERTAIN WHETHER DEFENDANT DSI COULD BE COMPELLED TO PAY A LARGER FINE.</u>

The criminal conduct charged by the United States in this case was committed by certain employees of DSI, notably Ayman Shahid, Carey Hendrickson, and Jason Sterlino. The liability of DSI, a corporation, is based on the principle of *respondeat superior*.

DSI, however, is an entity that acts as a sales organization. It has employees, but the evidence would establish that DSI does not maintain large cash reserves, does not own assets, and does not itself have significant income. It exists to service other entities. It would not, based on the information in the government's possession, be able to pay a significant fine without contributions from other entities and individuals.

As part of this negotiated settlement, DSI will pay an $8 million fine and make a $3 million restitution payment using money that could very well not be available after a trial and contested sentencing. DSI might not be able to pay any fine after a trial and could simply go out of business. To collect a larger fine in these circumstances, the government would be required to

rely on agency or alter ego theories that are fraught with uncertainty and by no means assured of success.

The most important feature of this plea agreement is that it guarantees collection of the fine and restitution amounts. The government believes that a negotiated settlement with a significant fine and restitution payment guaranteed, is preferable to devoting significant time and resources to a case in which the defendant might end up paying nothing because it has no money.

Dated: December 1, 2016

BRIAN J. STRETCH
United States Attorney

By: */s/ John H. Hemann*
John H. Hemann
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA